EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ANTONIO LEBRÓN, acusado y apelante.

*Número:* CR-77-118 *Resuelto:* 26 de enero de 1979

*Carmen Ana Rodríguez Maldonado,* abogada del apelante; *Héctor A. Colón Cruz, Procurador General* y *Josefa A. Román García, Procuradora General Auxiliar,* abogados de El Pueblo.

El Juez Presidente Señor Trías Monge emitió la opinión del Tribunal.

Nos toca examinar hoy otro vital aspecto de la protección contra registros y allanamientos irrazonables.

El 8 de setiembre de 1972 dos agentes de Rentas Internas penetraron en una finca del barrio Maizales de Naguabo. No tenían orden de allanamiento ni revela el récord que su acción se debió a confidencia alguna que recibiesen. Tampoco contaban con el consentimiento de los dueños de la finca. Entraron por la colindancia del predio con la carretera, pasando por debajo de los alambres de la cerca. Desde la carretera no se vislumbraba ninguna actividad ilegal.

Se adentraron los agentes por un camino y hallaron dos alambiques en una maleza. De ellos salía una manga que les suplía agua desde la cocina de la casa del apelante. Desmontaron la manga y ocuparon la prueba. El récord no revela la distancia entre los alambiques clandestinos y la casa del señor Lebrón. Los alambiques fueron descubiertos en una parte de la finca perteneciente a un coacusado.

Más tarde la policía arrestó al apelante, se le imputaron diversos delitos y se le halló culpable de dos infracciones al Art. 113 de la Ley de Bebidas, Ley Núm. 143 de 30 de junio de 1969, 13 L.P.R.A. sec. 6113, y una al Art. 110, 13 L.P.R.A. sec. 6110. El tribunal le impuso al apelante una multa de $300.00 en cada uno de los casos de infracción al Art. 113 o en su defecto un día de cárcel por cada dólar que dejare de satisfacer, hasta un máximo de noventa días. En el caso de infracción al Art. 110 se le impuso una multa de $50.00, con igual alternativa.

■ El Art. II, Sec. 10 de la Constitución del Estado Libre Asociado de Puerto Rico dispone en parte:

"No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.

. . . . . . . .

Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse."

Se funda esta disposición en lo prescrito en la Enmienda Cuarta a la Constitución de Estados Unidos, pero su interpretación no ha sido, ni tiene necesariamente que ser, históricamente paralela en todo sentido con tal enmienda. *Pueblo* v. *Dolce*, 105 D.P.R. 422, 426–431 (1976).

Como hemos señalado en otras ocasiones, *Dolce*, 426 y ss., la garantía contra los registros y allanamientos ha sufrido una vida azarosa en la jurisprudencia norteamericana. Numerosos enfoques, antagónicos entre sí, se disputan el campo. El propio Tribunal Supremo de Estados Unidos reconoce y a ratos ilustra las divergencias que afectan el entendimiento de esta doctrina. *Cady* v. *Dombrowski*, 413 U.S. 433, 440 (1973); *Coolidge* v. *New Hampshire*, 403 U.S. 443 (1971); *Rakas* v. *Illinois*, 439 U.S. 128 (1978).

Estimamos que el problema estriba en buena parte en diferencias fundamentales sobre la naturaleza de la garantía en cuestión y las dos cláusulas en que se apoya. Sobre lo primero debemos decir que el temor al crimen y el natural deseo de combatirlo no deben oscurecer el propósito central de la disposición. Libremos el lenguaje original de su glosa abultada. La garantía contra los registros y allanamientos irrazonables representa la voluntad de negarles a los gobiernos mejor intencionados, en aras de una libertad individual preciada, medios eficaces y aun aparentemente indispensables para lograr objetivos meritorios. Se estructuró precisamente ese derecho para proteger al ciudadano aun de los gobiernos democráticos más escrupulosos. Amsterdam, *Perspectives on*

*the Fourth Amendment*, 58 Minn. L. Rev. 349, 353 (1974). Por bueno que sea el guardián, siempre existe el problema de quién lo vigila. *Quis custodiet custodiem*. Cuando se descuidan los medios, cuando se disminuyen los derechos fundamentales a nombre de un ansiado orden, lo que viene a perecer al cabo es la libertad y con ella la democracia que se quiso defender. Véase: *McNabb* v. *United States*, 318 U.S. 332, 347 (1943) (Frankfurter).

■ Respecto a las dos cláusulas que componen la garantía, la dificultad consiste en que en Estados Unidos ha habido un cambio de énfasis entre ambas. El criterio inicial era que el factor pertinente en pleitos de esta índole era la razonabilidad de la orden de registro. Ahora, aunque el péndulo ha oscilado repetidamente a través del tiempo, la tendencia es curiosamente a examinar la razonabilidad del registro en sí. Weinreb, *Generalities of the Fourth Amendment*, 42 U. Chi. L. Rev. 47, 48 (1974). Este cambio sutil invierte los términos de la garantía y tiende a desnaturalizarlos. Consideramos que el primer paso a darse al analizar controversias relativas a la protección contra registros y allanamientos consiste, fuera de indagar la capacidad del acusado para invocar el privilegio, [1] en retrotraernos al tiempo inmediatamente anterior al registro. La primera pregunta es: ¿le era posible al gobierno obtener la orden correspondiente sin comprometer la eficacia del registro o la seguridad de sus agentes? La cuestión de la razonabilidad del registro se ataca en segundo término, después de establecerse que podía actuarse sin orden judicial. Véase: Williamson, *The Supreme Court, Warrant-*

---

[1] No se cuestiona en este caso la capacidad del apelante para reclamar la garantía. Tampoco podría cuestionarse bajo la doctrina de *Pueblo* v. *Vargas Delgado*, 105 D.P.R. 335 (1976), ni bajo las diversas normas expuestas en *Rakas* v. *Illinois*, supra. Véanse: Trager & Lobenfeld, *The Law of Standing under the Fourth Amendment*, 41 Brooklyn L. Rev. 421 (1975); White & Greenspan, *Standing to Object to Search and Seizure*, 118 U. Pa. L. Rev. 333 (1970). La relación entre el acusado y la propiedad incautada representa suficiente base para la invocación de la garantía constitucional.

*less Searches, and Exigent Circumstances,* 31 Okla. L. Rev. 110, 143 (1978) ; Weinreb, *supra,* 77.

 Conforme a nuestra jurisprudencia una incautación sin orden judicial produce una presunción de invalidez sujeta a ciertas y limitadas excepciones. *Pueblo* v. *González Rivera,* 100 D.P.R. 651, 656–657 (1972). En el caso ante nos el récord está huérfano de razón alguna por la cual se procedió al registro sin orden judicial. La prueba fue por tanto obtenida presuntamente de modo ilegal.

El Ministerio Público argumenta, no obstante, que la garantía contra registros y allanamientos ilegales no se extiende a esta causa porque la prueba se halló en campo abierto.

 La llamada excepción del "campo abierto" no tiene el ámbito que el Estado supone. La excepción deriva del caso de *Hester* v. *United States,* 265 U.S. 57 (1924). En *Hester* ciertos agentes de rentas internas, por causa de información recibida, penetraron en propiedad ajena en busca de licor clandestino. Vieron a los acusados con unas botellas. Dieron voces de alarma y los persiguieron. Los acusados lanzaron al suelo el licor que cargaban. El tribunal resolvió que no había habido registro o allanamiento porque los agentes se habían incautado de propiedad abandonada en campo abierto. En *Pueblo* v. *González Charón,* 83 D.P.R. 450 (1961), nos apoyamos en *Hester* para justificar la incautación de ron clandestino, pero se trataba allí también de prueba abandonada, y aun más, abandonada en una carretera pública en el proceso de una fuga. En el caso presente no se trataba, independientemente del modo que quiera describirse el lugar de su hallazgo, de prueba abandonada. No puede acudirse a *Hester* para anular aquí la garantía contra registros y allanamientos ilegales.

*Hester* engendró su progenie, la cual también exige cuidadosa atención. Se ha utilizado a *Hester* para permitir que un inspector de sanidad tomase en el patio de una fábrica de

admisión no restringida una prueba del humo emitido por ésta para determinar si se estaban violando las leyes ambientales. *Air Pollution Var. Bd. of Colo.* v. *Western Alfalfa Corp.*, 416 U.S. 861 (1974). La corte señaló que el inspector simplemente estaba analizando un objeto visible por el público desde sitios públicos. *Air Pollution* tampoco ayuda al Ministerio Público en este caso, ya que los alambiques no estaban visibles desde fuera de la finca. En lo que toca a la utilización en este caso de otra doctrina independiente, la de la prueba a plena vista, es claro que ésta no se aplica aquí. *Pueblo* v. *Dolce*, 105 D.P.R. 422 (1976). El Estado, con entera razón, no funda su caso en *Air Pollution* o en la doctrina de la prueba a plena vista. (2)

■ Otra consecuencia derivable en parte de *Hester* fue la fascinación por largo tiempo con la naturaleza del sitio, a fin de aplicar la garantía contra registros irrazonables a ciertos lugares específicos, con exclusión de los "campos abiertos". Se protegió así en la jurisprudencia norteamericana el hogar, extendiéndose luego esta protección a sus inmediaciones, el llamado "curtilage". Los tribunales invirtieron vasta energía en definir estas "inmediaciones". ¿Qué distancia cubren a partir del hogar? ¿Alcanzan o no a toda una finca? Si la finca no está cercada, ¿es parte del "curtilage"? Hay sentencias a favor de las más variadas posiciones. Note, *A Reconsideration of the Katz Expectation of Privacy Test*, 76 Mich. L. Rev. 154, 177 (1977). En *United States ex rel. Gedko* v. *Heer*, 406 F.Supp. 609, 615–616 (W.D. Wis. 1975), se resolvió que una finca cercada de 160 acres con un rótulo prohibiendo el paso no podía estar sujeta al registro sin orden. En *United States* v. *Holmes*, 521 F.2d 859, 870 (5th Cir. 1975), confirmado parcialmente, sin afectar el principio expresado, 537 F.2d 227 (5th Cir. 1976), se sostuvo que una finca rural no requiere

---

(2) Valga reiterar que tanto los casos de prueba abandonada como los del acto-ilegal-a-plena-vista deben satisfacer los criterios expuestos en *Pueblo* v. *González del Valle*, 102 D.P.R. 374, 378 (1974).

dicho rótulo para retener la protección de la Enmienda Cuarta. Desde el punto de vista de *Gedko*, por tanto, la protección constitucional que nos ocupa es tan solo invocable por personas con los medios de fortuna para cercar y rotular sus fincas. Esta distinción es, naturalmente, insostenible.

*Katz* v. *United States*, 389 U.S. 347 (1967), cambió la dirección de este enfoque. *Katz* recalcó que la garantía constitucional protege fundamentalmente a las personas. Son ellas sus beneficiarios primarios y no lugares específicos. La cuestión central es si la persona tiene un derecho razonable a abrigar, donde sea, dentro de las circunstancias del caso específico, la expectativa de que su intimidad se respete. Para el análisis de *Katz*, véanse: Note, *Katz and the Fourth Amendment: A Reasonable Expectation of Privacy or, A Man's Home is His Fort*, 23 Clev. St. L. Rev. 63 (1974); Note, *A Reconsideration of the Katz Expectation of Privacy Test*, 76 Mich. L. Rev. 154 (1977); Note: *Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments*, 90 Harv. L. Rev. 945 (1977). *Katz* representa más un refinamiento que una sustitución de la antigua doctrina, así como un recordatorio de los valores centrales que interesa proteger la garantía contra los registros y allanamientos irrazonables: la intimidad del ser humano y su dignidad innata. En este sentido el reconocimiento expreso en la Constitución del Estado Libre Asociado de estos dos valores, Art. II, Secs. 1 y 8, amplía sensiblemente el radio del equivalente de la Enmienda Cuarta en nuestra Constitución.

La retención de la doctrina del campo abierto en su versión más amplia se ha cuestionado después de la decisión en *Katz*. The American Law Institute, *A Model Code of Pre-Arraignment Procedure*, adoptado el 20 de mayo de 1975, comentario a la Sec. 260.4, pág. 552. Se ha señalado que "poco puede decirse a favor de conservar la doctrina del campo abierto en su versión amplia. En *Hester* ocurrió una entrada ilegal a un terreno. El derecho a una vida tranquila cubre tanto campos

como albergues. Invasiones clandestinas, provocadoras de actos de ayuda propia, no conducen al buen orden". *Loc. cit.* Véase: *Wattenburg* v. *United States*, 388 F.2d 853, 857–858 (9th Cir. 1968).

Resolvemos en conclusión que la doctrina de campo abierto se limita bajo la Constitución del Estado Libre Asociado a evidencia abandonada y tan solo en sitios donde no quepa, dentro de las circunstancias del caso en cuestión, el derecho a una expectativa razonable de intimidad. Resolvemos además que al apelante le asistía el derecho a esperar que no se transgrediese la cerca de su finca. Debió obtenerse en este caso una orden previa de registro y allanamiento.

*Se revocan las sentencias apeladas.*

El Juez Asociado Señor Díaz Cruz disiente en opinión a la cual se une el Juez Asociado Señor Negrón García.

—O—

Opinión disidente del Juez Asociado Señor Díaz Cruz a la que se une el Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 26 de enero de 1979

El apelante tenía dos alambiques en la maleza, dentro de una finca perteneciente a un coacusado, con una línea de agua consistente en una manga que desde la cocina de su casa los alimentaba. El 8 de septiembre de 1972, dos agentes de Rentas Internas, sin orden de allanamiento, entraron a la finca pasando bajo los alambres de la cerca en el punto en que la bordeaba la carretera, se adentraron en el predio y encontraron los alambiques. Como consecuencia del hallazgo, el apelante fue arrestado y sometido a juicio; fue convicto por infracciones de la Ley de Bebidas Alcohólicas (Ley Núm. 143 de 30 junio, 1969, 13 L.P.R.A. sec. 6113) y del Art. 110 (13 L.P.R.A. sec. 6110), y se le condenó al pago de multas que

totalizan $650.00. En su recurso a este Tribunal plantea la ilegalidad del allanamiento e incautación.

La cuestión no se decide como propone la mayoría restringiendo la doctrina de campo abierto[1] a evidencia abandonada, que es una faceta aparte de la teoría jurídica en torno a los registros. Y es enteramente inaceptable la aseveración en la opinión en cuanto a atribuir "presunción de invalidez" a toda incautación sin orden judicial.

El arribo de la privacidad a una máxima jerarquía en el orden de derechos constitucionales ha tenido notable acogida en nuestra jurisprudencia contemporánea, desde *Sucn. de Victoria* v. *Iglesia Pentecostal,* 102 D.P.R. 20 (1974), hasta *Figueroa Ferrer* v. *E.L.A.,* 107 D.P.R. 250 (1978). En torno al derecho a la vida íntima (privacidad) gira la protección constitucional provista tanto en la Cuarta Enmienda de la Constitución Federal como en la correspondiente Sec. 10, Art. II de la nuestra, contra registros y arrestos arbitrarios. Es premisa fundamental del concepto de privacidad que la misma no se extiende hasta donde quiera llevarla el individuo, sino que su expectativa se circunscribe al ámbito que un pueblo libre pueda legítimamente aceptar. No basta con que la persona haya exteriorizado una concreta aunque subjetiva expectativa de privacidad; es necesario que ésta tenga la calidad de aprobación general, que sea, en la frase del Juez Harlan[2] "una que la sociedad está preparada para reconocer como 'razonable'." Opinión concurrente en *Katz* v. *United States,* 389 U.S. 347 (1967), a la pág. 361. "... La Corte sostuvo en

---

[1] *Hester* v. *United States,* 265 U.S. 57 (1924).

[2] El Juez ilustra el ámbito aceptable de la expectativa de privacidad, así:

"De este modo la casa de un hombre es, para la mayoría de los propósitos, el sitio donde él espera disfrutar de privacidad; pero los objetos, actividades y declaraciones que él expone 'a plena vista' de extraños no están protegidos porque tal acto no revela intención de guardárselos para él. Tampoco tendrán protección aquellas conversaciones abiertas a oídos de los demás, pues la expectativa de privacidad bajo las circunstancias sería irrazonable." *Cf. Hester* v. *United States,* 265 U.S. 57 (1924).

*Katz* que la capacidad para invocar protección de la Enmienda Cuarta no depende de un derecho de propiedad en el sitio invadido, sino de la legítima expectativa de privacidad que en dicho sitio tenga la persona que reclama protección." *Rakas* v. *Illinois*, 439 U.S. 128 (1978) a la pág. 143. Ya se había dicho en *Cardwell* v. *Lewis*, 417 U.S. 583, 589 (1974), que "el objetivo primario de la Cuarta Enmienda es la protección de la vida íntima." ". . . No debe entenderse que la presencia legítima en el sitio es irrelevante a la expectativa de privacidad, pero tampoco debe considerarse decisiva." *Rakas*, supra.

A la luz de estos principios, la contención del apelante no prevalecería ni aún trasladada del campo raso a una casa de vivienda, toda vez que no ha establecido que tenga alguna legítima expectativa de privacidad en el lugar en campo abierto donde apareció instalado el alambique. El campo raso fue desligado del ámbito de protección de la Cuarta Enmienda desde que el Juez Holmes escribió *Hester*, 265 U.S. 57 (1924), precisamente en un caso en que agentes del fisco irrumpieron en una propiedad privada y presenciaron la venta de whisky clandestino. Es tan patente la ausencia de toda expectativa de privacidad en quien monta un alambique en campo abierto, como en quien siembra marihuana en recinto cercado con rótulo de "Propiedad privada, prohibido el paso".

La supremacía de la norma de expectativa de privacidad, sobre la presencia legítima en el lugar y momento del allanamiento, fue mantenida por este Tribunal[3] en *Pueblo* v. *Domínguez Fraguada*, 105 D.P.R. 537, 544 (1977), al expresar que "la privacidad no sigue a los documentos como una sombra" y que se pierde con el egreso y proyección de papeles y efectos fuera del ámbito de vida íntima del individuo. Quien invoca la protección constitucional debe demostrar que tomó las precauciones normales para mantener su privacidad.

---

[3] Con el único disenso sin fundamentar del Juez Presidente Señor Trías Monge.

Nuestra doctrina en *Pueblo* v. *Domínguez Fraguada*, supra, ha recibido confirmación reciente por el Supremo Federal en *Rakas* v. *Illinois*, supra. Ya antes se había reconocido el énfasis en la conducta afirmativa de la persona que desea proteger su derecho de intimidad: el hombre que aunque viviendo en apartamiento propiedad de un amigo tiene la llave y tanto control como el dueño para excluir al resto del mundo de su posesión (*Jones* v. *United States*, 362 U.S. 257 (1960)); el que guarda sus efectos personales en baúl con doble cerradura (*United States* v. *Chadwick*, 433 U.S. 1, 11 (1977); el que cierra tras sí la puerta de la caseta telefónica y paga la tarifa exigida por su llamada (*Katz* v. *United States*, 389 U.S. 347, 352 (1967)).

La zona en la cual pueda la persona reclamar protección de su vida íntima no es área delimitada con hitos inconfundibles, mas sí está restringida por los usos y costumbres que en la convivencia social forjan el concepto de lo que es intimidad. Quien espera conservar en secreto la operación de un alambique clandestino no lo monta en campo raso con una línea de agua conectada a la cocina de su casa, pues su expectativa de intimidad es inexistente en un país de nuestra densidad poblacional y fluidez circulatoria. El apelante, lejos de albergar una expectativa de privacidad, asumió el riesgo calculado del descubrimiento, factor de operación inevitable con el que han vivido por *ilo tempore* los elaboradores de ron cañita. Tampoco tendrían esa expectativa los que almacenen explosivos, drogas o armas en cuevas o casas abandonadas. El fortalecimiento de los derechos humanos en el sentido profundo y abarcador, libre de utopía, no se promueve desplegando mantos de protección cuya transparencia deja al desnudo la ilegitimidad del reclamo constitucional. ¿Cómo entender la proscripción de "registros, incautaciones y allanamientos irrazonables" (Constitución, Art. II, Sec. 10) a manera de escapulario para los que violan la ley a la vista y al alcance de todo el que quiera mirar u oír? La Carta de

Derechos es ancla de libertad personal, y no dispensador promiscuo de inmunidad. Quien delata su intimidad no puede aspirar a que los demás se la respeten.

Confirmaría la sentencia apelada.