EL PUEBLO DE PUERTO RICO, peticionario, *v.* EFRAÍN ESPINET PAGÁN, acusado y recurrido.

*Número:* O-80-158        *Resuelto:* 20 de junio de 1980

PETICIÓN DE CERTIORARI para revisar una RESOLUCIÓN de *Dyana L. Ortiz Castro,* J. (Guayama), que declara con lugar una moción de supresión de evidencia ilegalmente obtenida. *Por estar igualmente dividido el Tribunal, se confirma.*

*Héctor A. Colón Cruz, Procurador General,* y *Américo Serra, Procurador General Auxiliar,* abogados del peticionario; *Martín González Vázquez* y *Nelson Escalona Colón,* abogados del recurrido.

---

Opinión del Juez Presidente, Señor Trías Monge, a la que se unen los Jueces Asociados, Señores Dávila, Torres Rigual e Irizarry Yunqué.

San Juan, Puerto Rico, a 20 de junio de 1980

La resolución del Tribunal Superior, Sala de Guayama, de 10 de enero de 1980 debe confirmarse. El registro efectuado en este caso fue irrazonable. La ocupación de material delictivo, trátese de 9,590 libras de marihuana o de un gramo, no convalida un allanamiento ilegal.

El tribunal de instancia excluyó la marihuana ocupada, entre otras razones, por el aura de incredibilidad de la prueba de cargo. Resolver lo contrario irrumpiría indebidamente en tan delicada zona y sustituiría el criterio de este foro apelativo por el del tribunal de instancia en la apreciación de los hechos y de la veracidad de los testigos, en ausencia del más leve indicio de pasión, prejuicio, parcialidad o error manifiesto por parte del juzgador primario. No es tal nuestra función. Véanse: *Pueblo* v. *Ortega Otero*, 97 D.P.R. 477 (1969); *Pueblo* v. *Santos Cornier*, 97 D.P.R. 193 (1969); *Sanabria* v. *Sucn. González*, 82 D.P.R. 885, 993-98 (1961).

El tribunal de instancia analiza cuidadosamente la prueba en su extensa y excelente resolución y la encuentra plagada de inverosimilitud. Las contradicciones, las vaguedades y las coincidencias sospechosas abundan, lo que acentúa el carácter estereotipado de los testimonios. La supuesta misión de los

policías envueltos era localizar un prófugo, pero da la casualidad que todos menos uno eran agentes de la Unidad de Drogas y lo que se encuentra es marihuana. Los agentes nunca habían visto al prófugo y la fotografía unida a la requisitoria era inservible por lo borrosa, (*) pero todos los agentes estuvieron seguros de que el acusado y el prófugo eran la misma persona, lo cual no era cierto, al observar su silueta a gran distancia. Juiciosamente preocupada por los valores envueltos, la distinguida juez de instancia efectuó una inspección ocular. Ninguno de los presentes pudo ver, aun con la ayuda de un telescopio, más que siluetas en el lugar concernido desde donde se hallaban los agentes de drogas, pero éstos alegaron haber percibido facciones. Mas leamos las determinaciones de la sala sentenciadora sobre éstos y otros particulares:

. . . Lo que nos preocupa, el punto sobre el cual gira la validez de las actuaciones de la Policía, es la determinación de cuál era el verdadero propósito de los agentes al entrar a la finca, si realmente fueron allí a localizar a un prófugo justificando con esto a su entrada al lugar, sin obtener la orden judicial.

Para hacer esta determinación no podemos hacer otra cosa que considerar la credibilidad del testimonio de los agentes. Por lo extenso de dicho testimonio lo hemos analizado cuidadosamente.

Varios detalles nos llaman la atención:

1) El Agente Pomales supuestamente recibió *personalmente* al confidente y participó en esta investigación y arresto, sin embargo, sus compañeros no mencionan en sus declaraciones que él recibiera la confidencia, sino que el *Sargento Flores* recibió una confidencia por teléfono ese mismo día. Nada más natural hubiera sido que él comentara la suya con sus compañeros durante el trayecto al lugar.

---

(*)NOTA DEL COMPILADOR: Véase esta fotografía en el Apéndice a la opinión del Juez Asociado Señor Negrón García, *infra*, pág. 80, sobre el título "Prófugo Benjamín Gómez Figueroa conocido por *Benji*".

2) A pesar de que en memorando sobre la confidencia no se menciona el nombre del prófugo ya hacía varios días que los agentes "habían visto la requisitoria (que data del 1977) en el Cuartel y en las academias" y "en la revisión de archivos" el Agente Pomales la había visto. Ninguno menciona haber visto alguna otra requisitoria con una descripción parecida a la de este prófugo, solamente esa.

3) La requisitoria del prófugo tiene una fotografía imposible de distinguir por lo borrosa (la fotografía que aparece en autos le fue unida después) sin embargo, solamente ver esa requisitoria en el Cuartel de la Policía, fue razón suficiente para que todos los agentes estuvieran seguros que el acusado y el prófugo eran la misma persona, a pesar de que ninguno de ellos llevó la requisitoria consigo para propósito de identificación del prófugo y de que ninguno había visto antes el prófugo.

4) Los agentes llevaron un telescopio que les entregó el Sargento Flores pero ninguno explica la razón por la cual salieron del Cuartel con ese telescopio ni mencionan el telescopio en sus declaraciones originales ante el Fiscal y ante el Juez que determinó causa probable.

5) A pesar de que en la inspección ocular resultó imposible a ninguno de los presentes ver más de la silueta de las personas en la casita por lo distante que se encuentra ésta de la carretera, los agentes alegadamente vieron claramente sus facciones.

6) Por casualidad, los agentes encargados de llevar a cabo esta identificación de prófugo, eran todos (con excepción de Pomales) de la Unidad de Drogas de la Policía.

Estos detalles nos traen serias dudas en cuanto al verdadero propósito de los agentes al entrar a esa finca.

¿Sobre la base de qué principios podríamos disipar las dudas que conmovieron la conciencia del magistrado que escuchó a los testigos, observó su comportamiento y aun realizó una inspección ocular del lugar de los hechos?

El tribunal de instancia señaló también su preocupación sobre el empleo del manido recurso de la evidencia a plena vista. La corte afirmó sobre este particular:

Alegadamente en el presente caso la evidencia ocupada estaba a plena vista, se veían dos sacos al lado de una puerta abierta. También el Tribunal Supremo de los Estados Unidos

en Coolidge v. Hampshire 403 U.S. 443 (1971) (Apéndice—pág. 6) y nuestro Tribunal Supremo en Pueblo v. González del Valle 102 D.P.R. 374 (1974) nos han prevenido contra las declaraciones estereotipadas en este aspecto. Nos resulta difícil creer que, estando todo el resto del cargamento de marihuana almacenado en estibas dentro de otra habitación, esos dos sacos estuvieran tan convenientemente situados al frente de una puerta abierta a la entrada de la casa.

¿Cómo creer lo que la sala sentenciadora no creyó?

El Tribunal Superior determinó por último que, desde el momento en que los agentes verificaron la presencia del supuesto prófugo, pudieron haber conseguido la correspondiente orden, "sin poner en peligro su seguridad ni perder el rastro del sospechoso ya que pudieron establecer vigilancia del lugar". ¿Cómo permitir un allanamiento en estas circunstancias? El Ministerio Público no pudo rebatir en este caso la presunción de que una incautación sin orden judicial constituye prima facie un registro ilegal. *Pueblo* v. *Lebrón*, 108 D.P.R. 324 (1979); *Pueblo* v. *González Rivera*, 100 D.P.R. 651, 656–57 (1972); *Vide: Wong Sun* v. *United States*, 371 U.S. 471, 480–481 (1963). El Tribunal Supremo de Estados Unidos decidió en *Payton* v. *New York*, 445 U.S. 573 (1980), que la cuarta enmienda a la Constitución norteamericana prohíbe a la policía efectuar un allanamiento sin orden en una residencia, aun cuando se intente llevar a cabo un arresto rutinario por un delito grave. El caso de autos envuelve una violación aún más flagrante del mandato constitucional.

Por las razones expresadas confirmaría la resolución recurrida.

—O—

Opinión del Juez Asociado Señor Negrón García, a la cual se unen los Jueces Asociados Señores Rigau, Martín y Díaz Cruz.

San Juan, Puerto Rico, a 20 de junio de 1980

El empate de hoy confirma la resolución del Tribunal Superior, Sala de Guayama, que suprimió la evidencia ocupada al recurrido Efraín Espinet Pagán —consistente de 115 sacos que contenían 9,500 libras de marihuana valorada en varios millones de dólares.

Estamos conscientes de la deferencia que merecen los foros primarios en materia de dirimir la prueba oral. Dicha regla no es inexorable ni inflexible. Coincidiríamos con dicho dictamen, si no existiera en autos suficiente evidencia documental que, unida al examen de la oral, según resumida, y a un proceso mental de conciencia judicial que tiene su génesis en las normas de conducta humana, nos permite, a nivel apelativo, descartar justificadamente las apreciaciones de dicho foro.

A poco se examine la razón de allí decidir, se observará que ha encontrado eco ante este Tribunal la tesis que caracteriza las acciones de los agentes del orden público como una conspiración policial fraguada con el deliberado propósito de entrar a una finca privada sin obtener orden judicial y obtener la convicción de Espinet. El resultado es, una vez más, que ante los tribunales se invierten los papeles y, desacreditada la Policía, se exonera sumariamente a un delincuente que, colaborando al comercio y distribución ilícitos, custodiaba un almacén de marihuana al por mayor.

Como veremos, la imputación a la conducta de los oficiales del orden público es injustificada. A juicio nuestro se cometió el error imputado y la marihuana en cuestión es admisible. Los hechos, según resumidos por la propia sala de instancia, son:

El día 14 de marzo de 1978 a las 2:00 de la tarde, el Agente del Negociado de Investigaciones Criminales de la Zona de Guayama, Elis O. Pomales, alegadamente recibió la visita de una persona, vecino del Bo. Pueblito del Carmen de Guayama, quien le informó:

"Que en una finca de los Pomales en el Bo. Carmen donde hay una casa deshabitada, se estaba ocultando un prófugo de la justicia que se había escapado del Campamento Guavate de Cayey.

Lo describe como trigueño, fuerte y de unos 5′ 8″ de estatura aproximadamente, bastante joven.

El informante no quiso dar su nombre debido a represalias." (Memorando del 15 de marzo de 1978—Ex. XIX del Pueblo).

El informante era una persona trigueña, como de 48 años de edad, de mediana estatura, a quien el Agente Pomales no conocía pues era la primera vez que lo veía. No conocía la reputación o integridad de esa persona y nunca supo su nombre ni su dirección. Esta persona aparentemente fue directamente a su oficina en el segundo piso del Cuartel de la Policía sin hablar con el retén en el primer piso.

Informados sus supervisores, Capitán Leonardo Ortiz y Sargento Carlos D. Flores de esta confidencia, el día 16 de marzo de 1978, los Agentes Pomales, Alejandro Colón y Jimmy Jamer Reyes, fueron enviados al lugar por orden del Sargento Flores. Según indican los tres agentes, en ese día, aproximadamente a las 9:00 A.M., el Sargento Flores había recibido una llamada telefónica sobre la confidencia en la cual le identificaron al prófugo como Benjamín Gómez Figueroa conocido por Benji. (Ninguno de los otros dos agentes menciona la confidencia recibida por el Agente Pomales.)

El Agente Pomales ya había visto la requisitoria de ese prófugo porque "estábamos bregando con el archivo de 1977. Va a haber una inspección del 1977 y yo estaba viéndola no porque la confidencia era que Benji estaba aquí, sino que había un prófugo que se estaba quedando en esta casa." (Transcripción de Vista Ocular—pág. 26.) El Agente Jimmy Jamer Reyes la había visto "días antes, . . . el día antes . . . y . . . el mismo día". El Agente Alejandro Colón la había visto en el cuartel. Ninguno la llevaba consigo cuando salieron a buscar al prófugo.

Por el camino hacia la finca se detuvieron y, utilizando un telescopio que el Agente Alejandro Colón llevaba, miraron hacia la casita en la finca. *Allí pudieron distinguir una persona que más o menos correspondía a la descripción del prófugo.* El Agente Jimmy Jamer Reyes lo vio recostado de un "virote" o poste del balcón de frente a ellos, le vio las facciones y era el

acusado Espinet. El Agente Pomales vio a un individuo joven trigueño, bastante alto, fuerte, que coincidía con la requisitoria. Lo vio de perfil. *El Agente Alejandro Colón vio una persona recostada de un 2" x 4" que se parecía al prófugo, que corroboraba la información que le habían suministrado al Sargento por teléfono* . . . *"más o menos esa misma persona que vi en frente de esa casita, tiene la misma descripción del prófugo Benji"*. (Declaración Jurada—Ex. XVI—Defensa.)

De ahí pasaron a la entrada de la finca, dejaron su automóvil estacionado a orillas de la carretera, y saltando una verja de alambre de púas, siguieron a pie por un callejón entre la maleza, que se dirige hacia la casita donde se encontraba el acusado. Caminaron guardando distancia uno del otro, siendo el primero el Agente Colón.

Al acercarse a la casita, Colón vio al acusado "sentado en un balconcito sin baranda y sin nada mirando hacia el mar". Cuando se acercó más al acusado "se había bajado del balcón y estaba parado de espaldas a ellos, mirando como hacia la Phillips". Tenía algo en la mano que el Agente Colón indicó a sus compañeros primero que era una escopeta y luego que era un machete. Al percatarse de su presencia, el acusado corrió hacia la casa; el Agente Colón lo persiguió y, cuando trató de subir a la casa, lo agarró por las piernas cayendo el acusado sobre el balcón con parte del cuerpo hacia adentro de la casa. Los otros dos agentes entonces intervinieron y desarmaron al acusado.

Por la declaración de los agentes resulta imposible precisar el momento exacto en el cual le indicaron al acusado que estaba arrestado. A veces indican que el Agente Colón se identificó como Policía y que le arrestaba en el mismo momento en que el acusado se viró y lo vio, otras veces indican que fue después de perseguirlo, cuando el acusado cayó al balcón, y otras, que fue mientras el acusado corría.

Todos están contestes sin embargo de que por una puerta abierta vieron dos sacos; los agentes Colón y Pomales vieron semillas y pepitas en el balcón y el piso y el Agente Colón sintió además *un olor fuerte* por lo que se percató de "que posiblemente se trataba de picaduras de supuesta marihuana." (Declaración Jurada—Ex. XVI—Defensa.)

Entraron entonces a la casa y en otra habitación, que también tenía la puerta abierta, encontraron el resto de la evidencia —115 ó 116 sacos de yute de aproximadamente 94 libras de

peso, llenos de marihuana, colocados en estibas a lo largo de las paredes, una balanza y otros artefactos. El acusado, antes y después de hacerle los agentes las advertencias sobre sus derechos, les manifestó, "esa marihuana no es mía; a mí me pagaron por cuidarla", y les manifestó además que tenía un acompañante llamado "Joe".

En la casa, además del material delictivo, encontraron "mattresses" *en el piso,* comestibles, revistas y libros, agua, linternas y una lata preparada para recibir desperdicios humanos. (Énfasis nuestro.)

Esencialmente, el razonamiento del tribunal a quo está predicado en que los agentes del orden debieron haber obtenido antes una orden de allanamiento, atribuyéndoles que fueron al lugar no a localizar al prófugo Benji, sino para justificar su entrada sin la correspondiente orden judicial. Discrepamos. Al así hacerlo, atribuye a las contradicciones y omisiones en los testimonios de los agentes unas implicaciones forzadas, pasando por alto que las mismas son insustanciales y explicables. *Per se* no anulan ni destruyen la credibilidad de éstos. Examinémoslas.

La *primera*: el tribunal da énfasis a que el Agente Pomales atestara que recibió personalmente al confidente, pero sus compañeros mencionan en sus declaraciones que fue el Sargento Flores quien telefónicamente la recibió. El Ministerio Fiscal explicó que esa confidencia la "recibió la policía en dos fechas distintas, el 14 de marzo por el Agente Pomales y el 16 de marzo de 1978 por el Sargento Flores". (A. O., pág. 6, Memo 1 de mayo de 1979.) Es natural pues, que los agentes hicieran hincapié en la de su superior y más reciente.

El *segundo* dato que impresiona al tribunal es que los agentes se percataran de la requisitoria del prófugo Benji, aun cuando el memo sobre confidencia no menciona su nombre y "ningún [agente] mencionar[a] haber visto alguna otra requisitoria con una descripción parecida a la de este prófugo". Confesamos que no alcanzamos a entender por qué era necesario que los agentes tuvieran que mencionar otra

requisitoria parecida. ¿Es que la había? ¿Tenían otros prófugos que parecerse a Benji? No debe perderse de vista que Benji nació en Guayama y que sus padres vivían allí. Era, pues, lógico el énfasis en prófugos de esa área.

*Tercero*: "La requisitoria de prófugo tiene *una* fotografía imposible de distinguir por lo borrosa, y solo de verla, los agentes concluyeron se trataba del prófugo Benji". Hemos examinado detenidamente esta evidencia. Ciertamente, de las dos fotografías de la requisitoria, *una* (1) está borrosa e inservible. Sin embargo *otra*, la de perfil, con relativa claridad muestra los rasgos físicos del prófugo Benji, corroborados por la descripción informativa sobre sus señas personales en el documento. Hay un parecido básico significativo entre Benji y Espinet según lo demuestra la reproducción de la fotografía en cuestión. (¹)

---

(¹) Al reproducirse ésta en nuestro sistema de fotocopiar, pierde un poco su claridad. (*) Obsérvese, no obstante, cómo aun con esas limitaciones la reproducción de la fotografía de perfil que aparece en la requisitoria antes aludida demuestra con suficiente fidelidad, en particular para mentes alertas como las de los agentes, la existencia de características fisonómicas comunes entre el prófugo "Benji" y el apelante Espinet.

(*) NOTA DEL COMPILADOR: Se refiere el Señor Juez ponente a la xerocopia que de ambas fotografías se hizo a la página 6 de su opinión original, según se puede constatar en los autos obrantes en este Tribunal, y no a la reproducción que ahora se hace y que se incluye como Apéndice de esta opinión (*infra*, pág. 80).

Prófugo Benjamín Gómez Figueroa conocido por Benji

*Cuarto:* Los agentes llevan un telescopio, y no mencionan este dato en sus declaraciones. Hubo prueba de que el agente E. Oscar Pomales era natural de aquel lugar y lo conocía. Es de suponer que éste estaba familiarizado con la casa en cuestión, que quedaba en la montaña, a distancia, discreta y convenientemente apartada de la carretera. Aceptada la omisión en la declaración jurada del uso del telescopio, ello no desmerece credibilidad, ni demuestra su inexistencia ni que no fuera usado, como no afecta la realidad de su existencia el que el agente Colón Velázquez *no* mencionara en su declaración del 19 de marzo de 1978 que se ocupó una delicada y costosa balanza de pesar "Toledo" y que había también en la casa " 'mattresses' en el piso, comestibles, revistas y libros, agua, linterna y una lata preparada para recibir desperdicios humanos". No es justo ni razonable, pues, exigir a los agentes el requisito de mencionar con lujo de detalles y precisión todo lo acontecido durante el descargo de su encomienda, so pena de afectar la credibilidad de éstos.

*Quinto:* Se aduce que en la inspección ocular realizada sólo fue posible distinguir, desde la carretera, nada más que las siluetas de las personas posando en la casa-almacén. *El valor de esta inspección ocular es dudoso.* Se efectuó en un día nublado y lluvioso, situación diametralmente opuesta a cuando ocurrieron los hechos en que era claro y soleado. Aun en circunstancias tan disímiles y de desventaja para reproducir fielmente el incidente y evaluar la capacidad de visión de los agentes, es interesante notar que la Juez, en su tercer intento, ". . . luego que *aclaró* el día *un poco*, vi[o] una persona vistiendo camisa blanca y pantalón verde, que por conocer la forma en que estaba vestida la identifiqué como el alguacil Navarro . . .". (T.E., pág. 2.) El Ministerio Fiscal "pud[o] distinguir cómo estaban vestidas las personas. En este momento estaba parado al lado del alguacil el compañero Fiscal Hernández. En la segunda ocasión . . . observ[ó] por el telescopio . . . más claro al alguacil Navarro". (T.E., págs.

2–3.) De igual modo, el propio abogado de la defensa observó "en *una* ocasión a través del telescopio [. . . y] pud[o] distinguir por la manera que estaba vestido, por la camisa clara y por fuera, al alguacil". (T.E., pág. 3.)

Siendo ello así, ¿se justifica descartar el testimonio de los agentes, que en día claro y soleado, auxiliados por el telescopio y con conocimiento previo sobre la descripción del prófugo Benji, según la confidencia, creyeron haberlo visto e identificado? ¿Es que resulta inverosímil y fabricada tal confusión? Honestamente creemos que no.

*Sexto*: El tribunal da énfasis a la "casualidad" de que tres (3) de los cuatro (4) agentes eran de la Unidad de Drogas. Otra vez la sala de instancia le atribuye a un hecho una consecuencia nefasta que no tiene. ¿Dónde en los autos existe evidencia de que agentes de drogas no pueden auxiliar a un compañero en un arresto? Aun apreciando los autos desde el punto de vista más favorable al acusado se puede arribar a una conclusión distinta.

El tribunal intima que el relato sobre la evidencia ocupada a plena vista —a base de que los agentes atestaron haber visto dos sacos al lado de una puerta abierta— es estereotipado. Concluye que "nos resulta difícil creer que, estando todo el resto del cargamento de marihuana almacenado en estibas dentro de otra habitación, esos dos sacos estuvieran tan convenientemente situados al frente de una puerta abierta a la entrada de la casa".

Con respeto al criterio de dicho foro, existen datos no contradichos que destruyen la proposición de testimonio estereotipado. *Primeramente,* la casa está localizada estratégicamente en una zona rural aislada, en una finca grande de varias cuerdas, cercada, a distancia de la carretera. Es lógico pensar que allí Espinet razonablemente podía esperar que no penetrarían agentes o personas que lo sorprendieran. En consecuencia, el *acto de dejar* abierta la puerta de por sí es explicable, pues pudo deberse a la razón expuesta, distracción

o falta de cuidado. En *segundo lugar*, no hay lógica en el argumento que esgrime de que estando almacenada la marihuana en otra habitación, hubiera dos (2) sacos frente a la puerta. Dicho razonamiento no toma en cuenta que también había una "balanza de pesar" cerca, casi de frente a la puerta y, además, "papel de estraza", todo ello indicativo de que existía allí una operación de reducir a tamaños pequeños la marihuana para su más fácil disposición y venta. Ante este cúmulo de circunstancias, no resulta increíble, y menos, estereotipado, la existencia de los dos sacos cerca de la puerta. Posiblemente ése era el sitio más cómodo y de mejor acceso para toda la operación y proceso clandestino que allí se llevaba a cabo.

Finalmente, el tribunal a quo estimó que los agentes, desde el momento en que verificaron la presencia del supuesto prófugo, pudieron haber conseguido la correspondiente orden "sin poner en peligro su seguridad ni perder el rastro del sospechoso ya que pudieron establecer vigilancia del lugar". Discrepamos.

Independientemente de si en las circunstancias apuntadas era necesaria la orden de registro previa —pues existía una de arresto contra el prófugo "Benji", que autorizaba a los agentes a adoptar las medidas conducentes a tal fin, inclusive penetrar en propiedad privada y forzar la entrada a una estructura, Regla 17 de Procedimiento Criminal—, [2] es dudoso el aserto del tribunal de que la búsqueda de dicha orden era sin perjuicio de perder a "Benji". Éste era un prófugo. Se había dado a la fuga antes. Sus antecedentes criminales lo hacían una persona peligrosa por delitos tales como acometimiento y agresión grave, violación, infracciones de la Ley de Armas, fuga, daños maliciosos y hurto de uso. Es

---

[2] "Por tanto, para propósitos de la Cuarta Enmienda, una orden de arresto fundada en causa probable [judicial] implícitamente lleva en sí autorización limitada para entrar a una vivienda en que el sospechoso vive, si existe razón para creer que se encuentra allí." *Payton* v. *New York*, 445 U.S. 573, 603 (1980) (traducción nuestra).

irrazonable ante este cuadro de hechos, y lo fluido e impreciso de la situación, especular y decidir *después*, que no había riesgo de que escapara nuevamente.

En resumen, los hechos narrados revelan que los agentes del orden se trasladaron y observaron al acusado a base de una confidencia. Bajo la creencia *bona fide* de haber identificado al prófugo "Benji" telescópicamente, en día claro y soleado, penetraron en la propiedad, interviniendo con él. Durante su arresto se percatan de la abundante marihuana almacenada. Cabe destacar, como dato importante, que no se cuestiona el parecido entre el prófugo "Benji", natural de Guayama, y el acusado Espinet. El examen que hemos realizado de las fotografías en evidencia comprueba este parecido. El registro de toda la casa fue razonable y necesario, pues ¿cómo conocer si había otras personas que pudieran poner en peligro la vida de los agentes? Ninguna persona con cierta imaginación, sentido de prudencia y autoprotección hubiese actuado de otra forma. *Pueblo* v. *Torres Resto,* 102 D.P.R. 532 (1974); *Pueblo* v. *Costoso Caballero,* 100 D.P.R. 147 (1971).

Revocaríamos la resolución del Tribunal Superior, Sala de Guayama, fechada 10 de enero de 1980.