EL PUEBLO DE PUERTO RICO, apelado, *v.* GERARDO RAMOS SANTOS, acusado y apelante.

*Número:* CR-90-10          *Resuelto:* 23 de diciembre de 1992

*Carmen Ana Rodríguez Maldonado*, Abogada Supervisora de la *División de Apelaciones de la Sociedad para Asistencia Legal*, y *Cándida Valdespino Zapata*, abogada de la *División de Apelaciones de la Sociedad para Asistencia Legal*, abogadas del apelante; *Jorge E. Pérez Díaz, Procurador General, Miguel A. Santana Bagur, Subprocurador General Interino*, y *Aida Ileana Oquendo Graulau, Procuradora General Auxiliar*, abogados de El Pueblo.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

Con motivo de la muerte del policía William Acevedo Martínez ocurrida el 3 de enero de 1989, se le radicaron cargos por asesinato en primer grado y por violación a los Arts. 4, 6 y 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 414, 416 y 418, al acusado apelante Gerardo Ramos Santos.[1] Luego de juicio por jurado, fue encontrado culpable de asesinato en primer grado y por violación a los Arts. 4 y 6 de la Ley de Armas de Puerto Rico, *supra*. El 19 de enero de 1990 fue sentenciado a cumplir una pena de noventa y nueve (99) años naturales por el delito de asesinato en primer grado y veinte (20) años por cada uno de los delitos de la Ley de Armas de Puerto Rico, a ser cumplidas en cárcel de forma consecutiva entre sí y conse-

---

[1] En las acusaciones se hizo constar el carácter de delincuente habitual del acusado apelante. Éste había sido convicto y sentenciado previamente por los delitos de asesinato en segundo grado, robo y violaciones a la Ley de Armas de Puerto Rico.

cutivas también con cualquier otra pena que estuviese cumpliendo. Se ordenó, además, la separación permanente del acusado apelante de la sociedad por su carácter de delincuente habitual.

Inconforme con los veredictos, el acusado presentó un escrito de apelación planteando la comisión de los errores siguientes:

... ERRO EL HONORABLE TRIBUNAL DE INSTANCIA AL DECLARAR NO HA LUGAR LA SUPRESION DE EVIDENCIA OCUPADA HABIENDOSE REALIZADO UN REGISTRO Y ALLANAMIENTO SIN ORDEN NI CONSENTIMIENTO EN EL APARTAMENTO DE UN TERCERO DONDE SE ENCONTRABA EL APELANTE.
... ERRO EL HONORABLE TRIBUNAL AL NO DARLE AL JURADO LA INSTRUCCION ESPECIAL EN RELACION A QUE UN TESTIGO DE CARGO ANUNCIADO Y NO PRESENTADO NI PUESTO A LA DISPOSICION DE LA DEFENSA, SE PRESUME QUE DE HABER DECLARADO LE ERA ADVERSO AL CASO DEL PUEBLO DE HABERLO PRESENTADO.

## I

A continuación haremos un breve resumen de los hechos que dieron lugar a las convicciones, según éstos surgen de la exposición narrativa de la prueba. El 3 de enero de 1989, en horas de la noche, el policía William Acevedo Martínez fue herido mortalmente a cuchilladas mientras prestaba vigilancia en el Parque Luis Muñoz Rivera. Murió mientras era trasladado al Centro Médico.

La noche en que ocurrieron los hechos, el guardia de seguridad Pedro Hye González prestaba vigilancia en el Tribunal Supremo. A eso de las 11:00 P.M. vio que desde el Parque Luis Muñoz Rivera se acercaba una persona hacia los portones principales del Tribunal. Desde la parte de adentro del portón le preguntó que para dónde iba. Éste le contestó que estaba buscando salida. El guardia de seguridad Hye González le indicó que la salida era para atrás. La

persona le contestó: "OK Chévere." Luego volvió a preguntar, "¿puedo coger para atrás?" Entonces se dirigió hacia los árboles, en dirección al Negociado de Investigaciones Especiales.

Hye González estaba como a cuarenta pies (40′) cuando habló con la persona. La conversación duró poco, de seis (6) a diez (10) segundos. Describió a la persona como "tofecito, trigueño con un afro pequeño. T-shirt verde y blanca y mahón despintado". Minutos después de haber hablado con esta persona, "cuando ya estaba caminando hacia arriba", oyó unos gritos. Cuando miró en dirección a los gritos vio a una persona que venía corriendo con la mano en el cuello. Cuando llegó la persona al portón del Tribunal, Hye González se dio cuenta que se trataba de un policía y abrió el portón. El herido le dijo "ayúdame, ayúdame que me asaltaron" y luego, mientras caía lentamente, "ten cuidado que tiene mi revólver". Hye González lo levantó y llevó dentro del edificio del Tribunal. Le puso la mano en el cuello mientras el policía, que resultó ser William Acevedo Martínez, le decía, "llámate al Cuartel en un 1050". Entonces se le agarró a la pierna y le dijo "ayúdame, ayúdame, no me dejes morir". Hye González llamó al Cuartel y cuando llegó la patrulla lo montaron y se lo llevaron al hospital.

Hye González identificó al acusado apelante en Sala. Desde el día de los hechos no lo había visto, aunque vio sus fotos en el periódico cuando lo arrestaron. No fue al Cuartel General a ver las fotografías relacionadas con el acusado apelante.

El Sargento de la Policía Juan A. Oliveras Nazario, quien para la fecha de los hechos dirigía la Unidad de Arrestos Especiales de la División de Operaciones Tácticas, declaró que iba hacia su casa cuando recibió la llamada indicando que habían asesinado un policía. Se personó al Cuartel, donde el retén le dijo que contestara el teléfono, que había información. La persona que llamó tenía voz femenina y no se identificó. Le dijo que Gerardo

Ramos Santos, c/p Gerardo, que se encontraba evadido del Campamento Penal de Guavate, había entrado al apartamento 1003-A del Residencial Las Acacias con un revólver en la mano y la ropa ensangrentada. La confidencia mencionó el nombre de Judith y de Gerardo. Trató de obtener más información, pero le fue imposible pues la persona enganchó el teléfono.

El Sargento Oliveras Nazario dio conocimiento de la llamada al Capitán Martín Díaz y al Teniente Bonillas. Solicitó que se hicieran las gestiones para corroborar la información recibida con el Campamento Guavate en lo que él organizaba el grupo de trabajo.

El Sargento Oliveras Nazario, como con treinta (30) policías armados con armas de reglamento y armas largas, se personaron al Residencial Las Acacias. Rodearon el edificio y registraron piso por piso y los incineradores hasta llegar al piso diez (10). Dejaron dos (2) policías por piso y enviaron dos (2) al piso once (11). El Sargento y los policías José Figueroa Garay y William Orozco Sánchez se dirigieron al apartamento 1003-A, cuya dueña se llamaba María Judith Fernández Ramos. Al llegar frente a éste, el Sargento Oliveras Nazario comenzó a llamar a Judith y a Gerardo. Les decía: "Abre la puerta es la Policía, sabemos que están ahí." Éstos no respondieron. En esos momentos el Sargento Oliveras Nazario vio al acusado apelante a través de unos bloques ornamentales. Al no abrir la puerta, la Policía la derribó. El acusado apelante y María Judith huyeron hacia el apartamento contiguo brincando de un balcón a otro. El agente Figueroa Garay ocupó una cuchilla que se encontraba sobre una mesa en el apartamento 1003-A. Estaba cerrada y tenía manchas de sangre.

Acto seguido, el Sargento Oliveras Nazario se dirigió al apartamento contiguo, el 1004-A, y tocó a la puerta. El Sr. Juan Salas Ugarte abrió y, luego que el Sargento le expre-

sara que estaban persiguiendo a una persona que se había internado en el apartamento, los dejó entrar.[2]

Al entrar, el Sargento Oliveras Nazario se topó con el acusado, en sólo calzoncillos, sentado en el pasillo, contra la pared, con las manos en la nuca. Éste le dijo que "no lo matara que él había matado al agente", que no le hicieran daño, que él "lo mat[ó] para robarle el revólver". Señaló con la vista al sofá donde se encontraba el arma que resultó ser la que se le había asignado a la víctima, al policía Acevedo Martínez.[3] Ocuparon el arma y arrestaron al acusado apelante.

La investigación del caso fue asignada al Agente Investigador Beldredín Román Vélez. Como parte de la investigación, esa misma noche fue con María Judith Fernández Ramos, la acompañante del acusado, al apartamento de ésta, el 1003-A en Las Acacias, para inspeccionar el área. La joven María Judith ya había prestado declaración jurada al Fiscal. En el apartamento fotografiaron el área y una ropa que estaba húmeda, una *T-shirt* blanca y un mahón *pre-washed*, ropa ésta similar a la descrita por el guardia de seguridad Hye González. Ocuparon también unos zapatos blancos.

La defensa, por su parte, presentó como testigo a un perito geólogo que declaró sobre los hallazgos de las muestras tomadas del terreno en la escena de los hechos y de los

---

[2] El Sargento Oliveras Nazario y los policías Figueroa Garay y Orozco Nazario declararon básicamente lo mismo en cuanto a este incidente. El señor Salas Ugarte, por su parte, atestiguó que al salir al pasillo de su casa se encontró con dos (2) personas, una mujer y el acusado apelante. No sabía quiénes eran. Les dijo que salieran que le podían traer problemas. El acusado le dijo que se metiera al cuarto, que si venían él se iba a entregar. Él no les había dado autorización de entrar a su casa. Les indicó que si la Policía tocaba, él les iba a abrir la puerta. Cuando la Policía tocó a la puerta él les abrió. Le preguntaron si conocía a los que vivían al lado, él contestó que no y entraron.

[3] Se estipuló que el Sr. Edgar Torres Rivera, Especialista en Armas de Fuego II, en el Laboratorio de la Policía declararía que el agente Román Vélez le entregó como evidencia un revólver marca Smith & Wesson, Modelo 65-3, Calibre 357, Magnum.

zapatos del acusado apelante que fueron ocupados en el apartamento 1003-A.

La defensa solicitó la supresión de la siguiente evidencia: el mahón y la camisa ocupados en el apartamento 1003-A; el revólver ocupado en el apartamento 1004-A, y las admisiones hechas por el acusado apelante al sargento Oliveras Nazario y a los policías Orozco Sánchez y Figueroa Garay.

## II

Un registro y allanamiento sin orden, al igual que un arresto sin orden, se presume irrazonable, por lo que compete al Ministerio Público rebatir la presunción de invalidez mediante la presentación de prueba sobre las circunstancias especiales que permiten actuar sin orden. *Pueblo v. Lebrón*, 108 D.P.R. 324 (1979); *Pueblo v. Falú Martínez*, 116 D.P.R. 828 (1986); *Pueblo v. Malavé González*, 120 D.P.R. 470 (1988). La disposición constitucional que brinda protección contra registros, allanamientos o arrestos irrazonables tiene como propósito el "proteger la intimidad y dignidad de los seres humanos, amparar sus documentos y otras pertenencias e interponer la figura de un juez entre los funcionarios públicos y la ciudadanía para ofrecer mayor garantía de razonabilidad a la intrusión ...". *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197, 207 (1984). Véanse: *Pueblo v. Martínez Torres*, 120 D.P.R. 496, 500 (1988); Art. II, Sec. 10 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1.

Esta norma general, sin embargo, tiene excepciones. Se ha permitido el registro sin orden cuando éste es incidental al arresto, *Pueblo v. Pacheco Báez*, 130 D.P.R. 664 (1992); *Pueblo v. Zayas Fernández*, 120 D.P.R. 158 (1987); *Pueblo v. Acevedo Escobar*, 112 D.P.R. 770 (1982); si se consiente al registro, *Pueblo v. Falú Martínez*,

supra; *Pueblo v. Narváez Cruz*, 121 D.P.R. 429 (1988); *Pueblo v. Tribunal Superior*, 96 D.P.R. 270 (1968); si se hace en una estructura abandonada, *Pueblo v. Erausquín Martínez*, 96 D.P.R. 1 (1968), y cuando se hace un acto ilegal a plena vista o cuando la evidencia es lanzada o abandonada, *Pueblo v. Dolce*, 105 D.P.R. 422 (1976); *Pueblo v. Espinet Pagán*, 112 D.P.R. 531 (1982); *Pueblo v. Ortiz Martínez*, 116 D.P.R. 139 (1985); *Pueblo v. Lebrón*, supra.

■ Al analizar una solicitud de supresión de evidencia, hay que determinar: (1) si el acusado que la solicita tiene capacidad para invocar el privilegio; (2) en ausencia de orden, si le era posible al Estado obtenerla sin comprometer la eficacia del registro o la seguridad de sus agentes, y (3) la razonabilidad del registro. *Pueblo v. Lebrón*, supra.

■ En cuanto al consentimiento para un registro sin orden previa prestado por un tercero, su validez depende "de si la persona que consintió tenía 'autoridad' para consentir [y si la] persona que reclama la protección [tenía] algún reclamo de expectativa razonable a la intimidad ...". E.L. Chiesa Aponte, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Ed. Forum, 1991, Vol. I, Sec. 6.15(B), Cap. 6, pág. 427. De acuerdo con la doctrina, esta autoridad no descansa en el derecho de propiedad sobre el objeto del registro, sino en su uso mutuo por personas que tienen una legítima expectativa de privacidad. Después de todo, el derecho a que no se lleven a cabo registros y allanamientos irrazonables, sin orden judicial previa, es personal y sólo puede renunciar a él la persona a cuyo favor se da, y no un tercero a su nombre. *Pueblo v. Barrios*, 72 D.P.R. 171 (1951).

■ Una persona que se encuentra ilegalmente en un sitio no tiene legitimación activa para reclamar el derecho contra un registro irrazonable garantizado constitucionalmente, pues no tiene expectativa de intimidad alguna. El

peso de probar que estaba legalmente en dicho sitio le corresponde al acusado. W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 2da ed., Minnesota, Ed. West Publishing Co., 1987, Vol. 4, Sec. 11.3(b).

■ Recientemente, en *Minnesota v. Olson*, 109 L.Ed.2d 85, 94–95 (1990), el Tribunal Supremo de Estados Unidos resolvió que el simple hecho de ser un invitado para pasarse la noche en una residencia es suficiente para demostrar que dicho invitado tiene una legítima expectativa de que su privacidad no será perturbada por otra persona que no sea su anfitrión y aquellos a quienes éste autorice a entrar a la residencia, y que esta expectativa de privacidad está protegida por la garantía constitucional de la Cuarta Enmienda de la Constitución federal. El Tribunal expresó:

> *To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society.* We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. *From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.*
> From the overnight guest's perspective, he seeks shelter in another's home precisely because *it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside.* We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend. Society expects at least as much privacy in these places as in a telephone booth— "a temporarily private place whose momentary occupants' expectations of freedom,

from intrusion are recognized as reasonable." (Citas omitidas y énfasis suplido).([4]) *Minnesota v. Olson*, supra.

## III

■ En cuanto al registro en sí, una vez establecida la existencia de un consentimiento válido, "el alcance de dicho registro será tan amplio como los términos del consentimiento prestado". (Énfasis suprimido.) *Pueblo v. Narváez Cruz*, supra, pág. 446.

A tenor con las normas antes expuestas, no cabe duda que el acusado apelante tenía legitimación activa para solicitar la supresión de la evidencia obtenida por la Policía, sin orden previa, cuando los agentes irrumpieron en el apartamento 1003-A de María Judith Fernández Ramos. A pesar de que el Sargento Oliveras Nazario testificó que, antes de romper la puerta del apartamento y entrar, él vio al acusado a través de unos bloques ornamentales, de la exposición narrativa de la prueba no surge que en ese momento el Sargento lo reconociera y supiera que éste era el convicto que se había evadido del Campamento Penal de Guavate. Con respecto al incidente ocurrido cerca del Tribunal Supremo, el Sargento sólo tenía la información provista por la llamada anónima recibida en el Cuartel y la descripción algo esquemática dada por el guardia de seguridad Hye González. Éste describió a la persona como "tofecito, trigueño con un afro pequeño". Como en esos momentos el apelante vestía únicamente calzoncillos, la descripción que Hye González había dado de la ropa no ayudaba a identificarlo. Durante esta incursión al apartamento de María Judith, la Policía ocupó una cuchilla que se encontraba sobre una mesa.

---

([4]) Para una crítica sobre la situación en Puerto Rico, véase E.L. Chiesa Aponte, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Ed. Forum, 1991, Vol. I, Sec. 6.5, págs. 314–316.

Al momento de ocurrir este allanamiento y la incautación de la cuchilla, el acusado era el invitado de María Judith, la dueña del apartamento. Aparentemente se estaba quedando allí. Como invitado de la dueña, tenía una expectativa legítima de privacidad. Sin embargo, de los autos no aparece que el acusado hubiese solicitado la supresión de esta evidencia ni que el Ministerio Público, luego de identificarla, la sometiera en evidencia.

Ahora bien, en lo que respecta a la evidencia obtenida en el apartamento contiguo, el 1004-A, el revólver de reglamento de la víctima y las admisiones hechas por el acusado apelante, la situación es muy distinta. El acusado no tenía legitimación activa para solicitar su supresión, pues carecía de una expectativa legítima de privacidad. No sólo estaba ilegalmente en dicho apartamento, sino que la Policía entró al mismo con el permiso y consentimiento del dueño.[5]

No hubo, por lo tanto, un registro o allanamiento ilegal e irrazonable.

En cuanto a la evidencia ocupada más tarde en el apartamento de María Judith, el 1003-A, cuando ésta voluntariamente regresó con los agentes y consintió en que éstos registrasen el apartamento, dicho registro tampoco fue irrazonable o ilegal. La dueña del apartamento, María Judith Fernández Ramos, consintió al mismo. La expectativa de intimidad de un huésped no incluye el que su anfitrión no pueda permitir que otros, legítimamente, entren a su propiedad y registren. Al entrar al apartamento 1003-A por

---

[5] Sobre este incidente hubo un testimonio contradictorio. Los agentes testificaron que solicitaron permiso para entrar y el dueño, el señor Salas Ugarte, se lo concedió; mientras que el señor Salas Ugarte testificó simplemente que abrió la puerta y éstos entraron, que él no le había dado permiso a persona alguna para estar allí. El juzgador de los hechos, el Jurado, dirimió credibilidad y, en ausencia de una demostración de que hubo pasión, prejuicio, parcialidad o error manifiesto, no intervendremos con la apreciación de la prueba hecha en instancia. *Pueblo v. Rivero, Lugo y Almodóvar*, 121 D.P.R. 454 (1988); *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986); *Pueblo v. Borrero Robles*, 113 D.P.R. 387 (1982).

segunda vez, la Policía ocupó la ropa húmeda del acusado apelante y sus zapatos. A tenor con lo antes expuesto, no procedía la supresión de esta evidencia.

Cabe señalar, además, que en el caso de autos la moción de supresión de evidencia se presentó tardíamente. Se presentó, *por primera vez*, luego de que concluyera el desfile de la prueba de ambas partes y de que la evidencia cuya supresión se solicitó hubiese sido admitida sin objeción por parte de la defensa. La Regla 234 de Procedimiento Criminal, 34 L.P.R.A. Ap. II (ed. de 1971), dispone que una moción de supresión de evidencia "se hará cinco días antes del juicio a menos que no hubiere oportunidad para ello o que al acusado no le constaren los fundamentos de la moción, o que la ilegalidad de la obtención de la evidencia surgiere de la prueba del fiscal".

De los autos originales no surge que en este caso se hubiera dado alguna de las excepciones que permiten que la moción de supresión se haga durante el juicio. *Pueblo v. Rey Marrero*, 109 D.P.R. 739 (1980).

No cabe duda que el acusado apelante tuvo amplia oportunidad de presentar la moción de supresión con antelación a la fecha señalada para el juicio. Los fundamentos para la supresión le constaban. Este, definitivamente, no es un caso en que la alegada ilegalidad surgiera de la prueba del Fiscal en el acto del juicio y que fuese entonces cuando se presentase la primera oportunidad del acusado apelante para cuestionarla. En el caso ante nos la defensa, sin hacer objeción alguna a la prueba que luego cuestionó, esperó hasta que desfilara ante el Jurado toda la prueba de ambas partes, antes de presentar la moción de supresión de evidencia. En circunstancias como éstas, la moción de supresión resulta ser indiscutiblemente tardía, debió presentarse con por lo menos cinco (5) días antes del juicio según dispone la Regla 234 de Procedimiento Criminal, *supra. Pueblo v. Pérez Cruz*, 103 D.P.R. 44, 48 (1974).

Por todas las razones antes expuestas, el primer señalamiento de error no se cometió.

## IV

El segundo señalamiento de error se basa en el hecho de que la testigo María Judith Fernández Ramos, quien aparecía en la acusación como testigo de cargo, no fue utilizada por el Ministerio Público ni fue puesta a la disposición de la defensa. El foro de instancia denegó una solicitud de la defensa para que se le diera al Jurado la instrucción especial con relación a un testigo de cargo anunciado y no presentado ni puesto a la disposición de la defensa. Basó dicha determinación en que se había hecho múltiples gestiones para localizar y poder producir esta testigo, sin que se hubiera podido conocer su paradero.

De la Minuta de 4 de octubre de 1989 surge que el tribunal dio instrucciones específicas para que se hicieran las gestiones pertinentes para localizar a la testigo María Judith Fernández Ramos. En dicha minuta se expresa lo siguiente:

> En este caso se han hecho múltiples gestiones y las ha hecho el Tribunal, para producir a la testigo. Se ordenó el arresto, se preparó citación y se envió a buscar a la testigo y la misma se ha desaparecido, por lo tanto no se puede producir. Que no existe prueba de que se haya escondido ni hay prueba de que el señor fiscal haya sido negligente para localizarla. El paradero se desconoce y ya esta situación se ha resuelto. Minuta de 4 de octubre de 1989.

El Ministerio Público expresó que en la vista preliminar la testigo la trajo la defensa, que tiene una declaración de ella la cual facilitó a la defensa, que dicha declaración[6] es

---

[6] Cabe señalar que la defensa no solicitó que dicha declaración jurada fuese admitida en evidencia al amparo de la excepción establecida en la Regla 64(B) de Evidencia, 32 L.P.R.A. Ap. IV.

contundente en contra del acusado y que de haber podido localizarla hubiese presentado a María Judith Fernández Ramos como testigo.

En el caso de autos, al igual que en *Pueblo v. Flores Berty*, 92 D.P.R. 577, 580–581 (1965), el Fiscal presentó unos testigos presenciales de los hechos sobre los cuales podría declarar la testigo María Judith Fernández Ramos. Su testimonio hubiese sido en muchos aspectos acumulativo de la prueba circunstancial presentada contra el acusado apelante. Al igual que en el caso *Pueblo v. Flores Berty*, supra, pág. 581, los autos demuestran que la testigo no estaba disponible para la fecha del juicio, en el caso de autos porque no había podido ser localizada. Bajo estas "circunstancias, no puede sostenerse que su testimonio fue voluntariamente suprimido y que de haber declarado dicho testigo su testimonio hubiera sido adverso al Pueblo". Íd., pág. 581. Véase, además, *Pueblo v. Díaz Díaz*, 102 D.P.R. 535 (1974). El segundo error señalado no se cometió.

Por todo lo antes expuesto, *se dictará sentencia confirmando la apelada.*

Los Jueces Asociados Señores Negrón García y Rebollo López concurrieron sin opiniones escritas. El Juez Asociado Señor Hernández Denton concurrió con la sentencia emitida por este Tribunal por entender que el dueño del apartamento donde se ocupó el arma consintió al registro.