ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL XI

| EL PUEBLO DE PUERTO RICO<br><br>Peticionario<br><br>v.<br><br>HÉCTOR A. ROSADO MATÍAS<br><br>Recurrido | KLCE202500617 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Caso Número: ISCR202300753, ISCR202300754, ISCR202300755<br><br>Sobre: Art. 6.05 y 6.22 de la Ley de Armas; Art. 401 de la Ley de Sustancias Controladas |
|---|---|---|

Panel integrado por su presidenta, la Jueza Brignoni Mártir, la Jueza Álvarez Esnard y la Jueza Prats Palerm.

Prats Palerm, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 24 de julio de 2025.

Comparece el Ministerio Público ("Peticionario") mediante *Petición de Certiorari* y nos solicita que revisemos la *Resolución* emitida el 14 de marzo de 2025 y notificada el día siguiente, por el Tribunal de Primera Instancia, Sala Superior de Mayagüez ("TPI"). En virtud del referido dictamen, el TPI suprimió evidencia obtenida sin mediar una orden judicial, tras determinar que el Ministerio Público no rebatió la presunción de ilegalidad del registro y arresto ni la sospecha que acarreaban los testimonios estereotipados de los agentes.

Por los fundamentos que proceden, se *expide* el auto de *certiorari* y se *confirma* el dictamen recurrido.

**I.**

Por hechos acontecidos el 6 de octubre de 2022, el Ministerio Público presentó seis (6) denuncias en contra de Héctor Rosado Matías ("señor Rosado Matías" o "Recurrido"), por violación a los Artículos 6.05 y 6.22 de la Ley de

Número Identificador
SEN2025_____

Armas[1], violación al Artículo 401 de la Ley de Sustancias Controladas[2], violación a los Artículos 3.23 (a) y 5.07 de la Ley de Vehículos y Tránsito[3], y violación al Artículo 246 (a) del Código Penal[4].

Tras los trámites de rigor, el 22 de enero de 2024, el recurrido instó una *Moción de Supresión de Evidencia sin Orden de Registro o Allanamiento*. Adujo que un arma de fuego incautada el día de los hechos debía ser suprimida, ya que la intervención fue realizada sin mediar una orden judicial. Sostuvo, además, que la intervención se basó en el testimonio estereotipado del agente Sigfredo Arce Izquierdo ("Agte. Arce"). Por otro lado, enfatizó que del testimonio del sargento José Chaparro ("Sgto. Chaparro") se desprendía que otro individuo fue quien abandonó el bulto donde se encontró el arma de fuego.

En respuesta, el 5 de febrero de 2024, el Ministerio Público presentó una *Contestación a Moción Solicitando Supresión de Evidencia*. Expuso que existían motivos fundados para la intervención y que el material fue ocupado, según lo establecido en *Pueblo v. Dolce*, 105 DPR 422 (1976).

Los días 9 y 10 de octubre de 2024, el foro de instancia celebró una vista de supresión de evidencia. Para un cabal entendimiento, incluimos un resumen de la prueba oral que se desfiló ante el foro primario y que este Panel cuidadosamente examinó.

El desfile de prueba comenzó con el testimonio del **Sargento José Luis Chaparro Torres.** Declaró que pertenecía a la División de Drogas y Narcóticos de Mayagüez.[5] Relató que, el 6 de octubre de 2022, el plan de trabajo para el día consistía en verificar diferentes áreas y residenciales de Mayagüez.[6] Aseveró que, como parte del plan, el Agte. Arce debía ubicarse en un vehículo confidencial no rotulado, con la intención de observar actividad criminal y transferir los motivos fundados.[7] Expresó que, luego de salir de la División de

---

[1] Ley 168-2019, según enmendada, conocida como la *Ley de Armas de Puerto Rico de 2020*, 25 LPRA secs. 466d y 466u.

[2] Ley 4 de 23 de junio de 1971, según enmendada, conocida como la *Ley de Sustancias Controladas de Puerto Rico*, 24 LPRA sec. 2401.

[3] Ley 22-2000, según enmendada, conocida como la *Ley de Vehículos y Tránsito de Puerto Rico*, 9 LPRA secs. 5073 y 5127.

[4] 33 LPRA sec. 5335.

[5] Regrabación de la vista del 9 de octubre de 2024, minuto 10:35.

[6] Íd., minutos 12:15-12:30.

[7] Íd., minutos 12:30-12:50.

Drogas, obtuvo información del retén acerca de individuos con armas de fuegos y drogas que se encontraban reunidos en el garaje Gulf de Añasco, en atención al entierro de una persona que había sido asesinada.[8]

Testificó que, consecuentemente, le ordenó al Agte. Arce que se dirigiera al garaje para corroborar la información provista.[9] Sin embargó, detalló que, tanto él, como el Agte. Arce corroboraron, al llegar al garaje, que allí no se encontraban los individuos.[10] Entonces, relató que el Agte. Arce decidió verificar el área del Residencial Francisco Figueroa, ubicado en Añasco.[11] Manifestó que, posteriormente, el Agte. Arce le notificó que observó al acusado frente al residencial con un grupo de personas y le transmitió su descripción.[12] Añadió que el agente le informó que iba a continuar vigilando al señor Rosado Matías para ver si cometía algún delito.[13] Manifestó, además, que el Agte. Arce lo llamó y le informó que el acusado se montó en un vehículo de motor Ford color negro y se dirigió hacia el interior del residencial con otros individuos.[14]

Manifestó que el agente le notificó que el acusado se marchó hacia el Rabo del Buey, conocido punto de droga que ubica entre los edificios 8 y 9 del residencial.[15] Añadió que el Agte. Arce le avisó que observó que el acusado tenía un arma de fuego color negro y que la depositó en un bulto tipo mochila del mismo color.[16] Detalló, además, que el Agte. Arce le indicó que el señor Rosado Matías abordó, junto a otros individuos, el vehículo Ford F-150, en dirección hacia el supermercado Mr. Special, y este le dijo que lo detuviera porque iba armado.[17]

Señaló que, en ese momento, se encontraba cerca del supermercado cuando observó al vehículo del acusado y vio que en el área de la caja llevaba a una persona.[18] Detalló que, como resultado, prendió el biombo y comenzó a tocar la sirena y la bocina para indicarle al señor Rosado Matías que se

---

[8] Íd., minutos 12:51-13:30.
[9] Íd.
[10] Íd., minutos 13:30-13:40.
[11] Íd., minutos 13:40-13:46
[12] Íd., minutos 15:20-15:50.
[13] Íd., minutos 15:51-15:55.
[14] Íd., minuto 16:58-17:23.
[15] Íd., minutos 17:24-18:00.
[16] Íd., minutos19:00-19:20.
[17] Íd., minutos 19:20-19:53.
[18] Íd., minutos 19:55-20:18.

detuviera, pero que este hizo caso omiso y aceleró.[19] Expresó, además, que se les unieron otras patrullas, las cuales también ordenaron que el acusado se detuviera, pero no lo hizo.[20] Narró que el vehículo continuó la marcha, incluso transitando en contra del tránsito y rebasando la luz del semáforo, hasta que se detuvo frente a la residencia del acusado.[21]

Manifestó que, al bajarse de la patrulla, se dirigió hacia el vehículo y el pasajero delantero se bajó inmediatamente y comenzó a correr en dirección hacia la parte posterior de la residencia.[22] Particularizó que la persona que se bajó del vehículo llevaba un bulto tipo mochila color negro en el área de la espalda.[23] Explicó que, tan pronto vio al individuo comenzar a correr, se fue detrás de él.[24] Detalló que el individuo corrió hacia el área del río y vio cuando soltó el bulto.[25] Relató que logró localizar el bulto, el cual abrió y encontró en su interior una pistola cargada, color negro, marca glock, que tenía un peine agrandado de calibre .40, dos peines adicionales, una máscara color crema, marihuana, una pipa para fumar y un envase con unas pastillas. [26] Aludió que el bulto era el mismo que vio en posesión de la persona que se bajó del vehículo porque observó cuando lo tiró.[27]

Señaló que, tras incautar el bulto, se dirigió hacia el frente de la residencia donde se encontraban los demás compañeros.[28] Indicó que el agente Kenneth Rodríguez Martínez ("Agte. Rodríguez Martínez") logró detener a varias personas, incluyendo al señor Rosado Matías.[29] Indicó que le dijo al Agte. Rodríguez Martínez que ocupó el bulto y le hizo entrega del mismo, ya que era el agente a cargo de la investigación.[30] Agregó que el Agte. Rodríguez Martínez les hizo a los detenidos las advertencias de ley y quedó a cargo del

---

[19] Íd., minutos 20:20-20:26.
[20] Íd., minutos 21:30-21:45.
[21] Íd., minutos 22:15-22:32.
[22] Íd., minutos 24:45-27:10.
[23] Íd., minutos 27:11-27:25.
[24] Íd., minutos 28:06-28:10.
[25] Íd., minutos 28:10-28:20.
[26] Íd., minutos 29:00-29:30.
[27] Íd., minuto 29:55.
[28] Íd., minuto 30:30.
[29] Íd., minutos 30:55-31:00.
[30] Íd., minutos 31:10-31:30.

caso.[31] Finalmente, manifestó que el Agte. Arce llegó al lugar del arresto e identificó al acusado.[32]

El desfile de prueba continuó con el testimonio del **Agte. Arce**. Confirmó que el plan de trabajo para el día de los hechos consistía en "salir a la calle a investigar y […] arrestar a las personas que estuviesen cometiendo un delito".[33]

Relató que, conforme al plan, salió a la calle en un vehículo confidencial conducido por él, junto al Sgto. Laboy, quien iba de pasajero.[34] Detalló que, alrededor de la 1:30 p.m. recibió una llamada del Sgto. Chaparro mediante la cual le indicó que había recibido información sobre unos individuos armados que se encontraban en el pueblo de Añasco, incluyendo al señor Rosado Matías.[35] Añadió que, luego de recibir la llamada, se dirigió hacia Añasco para verificar la información provista.[36]

Narró que, al llegar a Añasco, decidió dirigirse hacia el Residencial Público Francisco Figueroa de Añasco.[37] Manifestó que se percató de que frente al residencial había un grupo de personas y, entre ellos, se encontraba el recurrido.[38] Agregó que también observó un vehículo de motor Ford F-150, color negro, tablilla 1000112, y que tenía conocimiento que le pertenecía al señor Rosado Matías.[39] Puntualizó que le indicó al Sgto. Chaparro que iba a vigilar al acusado para ver si cometía algún delito y transferir los motivos fundados a sus compañeros.[40] Detalló que, entonces, observó al señor Rosado Matías y a otros individuos montarse en el vehículo del acusado.[41]

Relató que, luego, vio al vehículo entrar al residencial y, como resultado, le informó al Sgto. Chaparro que lo seguiría para ver si cometía algún delito y transferir los motivos fundados para intervenir.[42] Detalló que, una vez dentro

---

[31] Íd., minutos 32:50-33:05.
[32] Íd., minutos 33:06-33:30.
[33] Íd., minutos 1:19:00-1:20:05.
[34] Íd., minutos 1:20:15-1:20:42.
[35] Íd., minutos 1:20:43-1:21:10.
[36] Íd., minutos 1:22:25-1:22:30.
[37] Íd., minutos 1:22:30-1:22:45.
[38] Íd., minutos 1:22:45-1:22:55.
[39] Íd., minutos 1:23:20-1:23:35.
[40] Íd., minutos 1:25:05-1:25:25.
[41] Íd., minutos 1:25:50-1:26:10.
[42] Íd., minutos 1:26:10-1:26:22.

del residencial, el vehículo se estacionó en el Rabo del Buey, un conocido punto de drogas que ubica entre los edificios 8 y 9 del complejo.[43] Acto seguido, testificó que se estacionó en un lugar estratégico. [44] Testificó que, dando vigilancia, observó que el señor Matías Rosado sacó un arma de fuego color negro con un *magazine* extendido de la cintura derecha de su pantalón, se la enseñó al grupo de individuos y la depositó en un bulto tipo mochila del mismo color.[45] Particularizó que le transmitió al Sgto. Chaparro lo observado.[46]

Mencionó que, después, el acusado caminó hacia su vehículo, llevando consigo el bulto negro, y se montó en el lado del conductor, junto a los otros individuos.[47] Agregó que le pasó la información al Sgto. Chaparro para que interviniera con el vehículo cuando saliera del residencial.[48]

Detalló que, luego, escuchó que el Sgto. Chaparro ordenó la detención del señor Rosado Matías y que, posteriormente, pudo intervenir con él frente a la residencia del acusado.[49] Expresó que, al llegar al lugar de la intervención, el recurrido ya se encontraba bajo arresto.[50] Agregó que el Agte. Kenneth Rodríguez Martínez, agente a cargo de la investigación, tenía en su poder el bulto color negro y la pistola que vio en posesión del acusado.[51]

Por último, el desfile de prueba culminó con el testimonio del agente investigador, el Agte. Rodríguez Martínez. Indicó que, como parte del plan de trabajo para el día 6 de octubre de 2024, el Sgto. Chaparro le asignó una patrulla rotulada, en la cual él sería el conductor.[52] Confirmó que, por otro lado, al Agte. Arce se le instruyó observar si alguien cometía algún delito y transmitir los motivos fundados para intervenir.[53]

Relató que, durante el plan de trabajo, surgió información relacionada a un grupo de individuos que se encontraban reunidos en el garaje Gulf de

---

[43] Íd., minutos 1:26:38-1:27:55.
[44] Íd., minutos 1:28:00-1:28:15.
[45] Íd., minutos 1:29:05-1:29:55.
[46] Íd., minutos 1:30:35-1:30:50.
[47] Íd., minutos 1:30:55-1:31:25.
[48] Íd., minutos 1:31:26-1:31:31.
[49] Íd., minutos 1:31:42-1:32:05.
[50] Íd., minutos 1:32:06-1:32:20.
[51] Íd., minutos 1:32:30-1:32:56.
[52] Regrabación del 10 de octubre de 2024, minutos 2:10-2:49.
[53] Íd., minutos 2:53-3:05.

Añasco, con motivo del funeral de un joven asesinado.[54] Declaró que, como consecuencia, el Agte. Arce se dirigió al lugar en un vehículo confidencial.[55] Explicó que en la patrulla conducida por él se encontraba el Sgto. Chaparro como pasajero, quien tenía comunicación directa con el Agte. Arce.[56] Testificó que el Agte. Arce expresó que se dirigiría hacia el residencial Francisco Figueroa.[57]

Reseñó que, una vez el Agte. Arce llegó frente al residencial, este informó que divisó al señor Rosado Matías.[58] Expresó que el Agte. Arce detalló que el acusado tenía un grillete en su pierna derecha y se encontraba reunido con unos individuos.[59] Contó que el Agte. Arce reportó que el señor Rosado Matías se montó en un vehículo Ford F-150, color negro, y que se dirigió hacia el interior del residencial.[60] Narró que, varios minutos después, el Agte. Arce indicó que observó al recurrido bajarse del vehículo y que lo divisó en el área interior del residencial, entre los edificios 8 y 9.[61]

Añadió que el agente les comunicó que observó que el señor Rosado Matías tenía un arma de fuego que había guardado en un bulto color negro, tipo mochila.[62] Expresó que el Agte. Arce también les avisó que el acusado volvió a montarse en el vehículo Ford F-150 con otras personas y les transmitió el número de tablilla para que pudieran intervenir.[63]

Aseveró que, al Agte. Arce transmitir la información, él y el Sgto. Chaparro se encontraban en la patrulla frente al supermercado Mr. Special, en la Carr. 402 de Añasco.[64] Reveló que observó que le pasó por el lado un vehículo Ford F-150 con la misma tablilla que indicó el Agte. Arce y que en la parte posterior del vehículo había una persona, en contravención a la Ley de Vehículos y Tránsito.[65] Detalló que, como consecuencia, prendió los biombos

---

[54] Íd., minutos 3:10-3:30.
[55] Íd., minutos 3:31-3:45.
[56] Íd., minutos 4:00-4:25.
[57] Íd., minutos 5:00-5:05.
[58] Íd., minutos 5:08-5:10.
[59] Íd., minutos 5:15-5:35.
[60] Íd., minutos 5:35-5:45.
[61] Íd., minutos 6:00-6:22.
[62] Íd., minutos 6:23-6:30.
[63] Íd., minutos 6:35-7:03
[64] Íd., minutos 7:05-7:15.
[65] Íd., minutos 7:15-7:38.

y la sirena y mandó a detener el vehículo.[66] Sin embargo, explicó que el conductor hizo caso omiso al comando e incluso se fue en contra del tránsito.[67] Manifestó que siguió indicándole al vehículo que se detuviera, pero que este rebasó los vehículos y un semáforo en luz roja.[68]

Expuso que logró detener al vehículo en el kilómetro 2.2, donde se desmontó de la patrulla y observó que del pasajero frontal del vehículo se bajó un individuo vestido de negro, sujetando una mochila color negro.[69] Declaró que, al ver esto, le gritó al Sgto. Chaparro para que lo ayudara con la persona porque había huido, mientras él decidió ir hacia el conductor del vehículo.[70] Reseñó que vio al Sgto. Chaparro corriendo detrás de la persona que se había bajado del vehículo.[71]

Testificó que, entonces, le dio instrucciones al señor Rosado Matías para que se bajara del vehículo y que, una vez lo hizo, notó que coincidía con la descripción provista por el Agte. Arce.[72]

Detalló que, posteriormente, el Sgto. Chaparro regresó con el bulto color negro que había observado que el pasajero frontal llevaba en sus manos cuando salió corriendo.[73] Expuso que el Sgto. Chaparro le indicó que dentro del bulto había un arma de fuego, varios cargadores y una sustancia que aparentaba ser marihuana.[74] Narró que, luego, procedió a leerle las advertencias a todos los ocupantes del vehículo y los colocó bajo arresto.[75] Por último, expresó que cuando el Agte. Arce llegó al lugar del arresto, identificó al recurrido como la persona que vio con el bulto y el arma de fuego incautada.[76]

Aquilatada la prueba testifical y documental, el 14 de marzo de 2025, el foro de instancia emitió una *Resolución*, en virtud de la cual suprimió la evidencia incautada el día de los hechos. En síntesis, el foro de instancia

---

[66] Íd., minutos 7:40-7:43.
[67] Íd., minutos 7:45-7:53.
[68] Íd., minutos 7:55-8:03.
[69] Íd., minutos 8:05-8:25.
[70] Íd., minutos 8:30-8:45.
[71] Íd., minutos 9:00-9:07.
[72] Íd., minutos 9:10-9:35.
[73] Íd., minutos 11:15-11:28.
[74] Íd., minutos 11:30-11:42.
[75] Íd., minutos 11:45-11:53.
[76] Íd., minutos 11:54-12:20.

determinó que, los agentes se encontraban en el lugar de los hechos con el propósito de esperar a que el acusado cometiera un delito. Destacó que "[l]os agentes tuvieron la intención de encontrar al acusado con material delictivo y desde el principio **decidieron no obtener una orden de registro para su persona**."[77] (Énfasis suplido).

Inconforme, el 4 de junio de 2025, el Ministerio Público acudió ante nos mediante *Petición de Certiorari* y realizó los siguientes señalamientos de errores:

> **El Tribunal de Primera Instancia cometió un error de derecho al suprimir la evidencia ocupada, ya que su ilegalidad surgió a plena vista, y su ocupación fue el resultado de haber sido arrojada durante una persecución policial, por lo que el recurrido no tenía una expectativa razonable de intimidad que activara la cláusula de exclusión por razón de un registro y allanamiento irrazonable.**

> **El Tribunal de Primera Instancia abusó de su discreción al catalogar como estereotipados y descartar los testimonios de los agentes, a pesar de que estos ofrecieron detalles adicionales más allá de los elementos mínimos del delito y explicaron de forma cabal los trámites y resultados de la vigilancia realizada.**

El 13 de junio de 2025, notificada el 23 de junio de 2025, dictaminamos una *Resolución* mediante la cual le concedimos al recurrido un término de diez (10) días para presentar su alegato en oposición. Transcurrido el término otorgado, procedemos sin el beneficio de su comparecencia.

**II.**

**-A-**

El auto de *certiorari* es un vehículo procesal que permite a un tribunal de mayor jerarquía revisar las determinaciones de un tribunal inferior. En esencia, se trata de un recurso extraordinario mediante el cual se solicita al tribunal de superior jerarquía la corrección de un error cometido por el tribunal inferior. *Rivera et als. v. Arcos Dorados,* 212 DPR 124 (2023); *800 Ponce de León Corp. v. American International Insurance,* 205 DPR 163 (2020); *Medina Nazario v. McNeil Healthcare, LLC*, 194 DPR 723, 728-729 (2016); véase, además, Art.

---

[77] Apéndice de la parte peticionaria, pág. 24.

670 del Código de Enjuiciamiento Civil, 32 LPRA sec. 3491. Por tanto, la expedición del auto de *certiorari* descansa en la sana discreción del tribunal revisor. *Íd.; IG Builders et al v. BBVAPR*, 185 DPR 307, 337-338 (2012).

La expedición del auto y la adjudicación en sus méritos es un asunto discrecional. No obstante, tal discreción no opera en el abstracto. *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83, 96 (2008). La Regla 40 del Reglamento del Tribunal de Apelaciones establece los criterios que este foro tomará en consideración para ejercer prudentemente su discreción para expedir o no un recurso de *certiorari*, a saber:

A. Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos son contrarios a derecho.
B. Si la situación de hechos planteada es la más indicada para analizar el problema.
C. Si ha mediado prejuicio, parcialidad, o error craso y manifiesto de la apreciación de la prueba por el Tribunal de Primera Instancia.
D. Si el asunto planteado exige consideración, más detenida a la luz de los autos originales, por los cuales deberán ser elevados, o de alegatos más elaborados.
E. Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.
F. Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.
G. Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

4 LPRA Ap. XXII-B

De otra parte, este Tribunal solo intervendrá con las determinaciones discrecionales del Tribunal de Primera Instancia, cuando se demuestre que hubo un craso abuso de discreción, prejuicio, parcialidad o error manifiesto. *Trans-Oceanic Life Ins. v. Oracle Corp.*, 184 DPR 689, 709 (2012), citando a *Lluch v. España Service Sta.*, 117 DPR 729, 745 (1986). En el ámbito jurídico la discreción ha sido definida como una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera. *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414, 434-435 (2013). La discreción se nutre de un juicio racional apoyado en la razonabilidad y fundamentado en un sentido llano de justicia. *Íd.* Por lo anterior, un adecuado ejercicio de discreción judicial está estrechamente relacionado con el concepto de

razonabilidad. *Umpierre Matos v. Juelle Albello*, 203 DPR 254, 275 (2019); *Rivera y otros v. Bco. Popular*, 152 DPR 140, 155 (2000).

**-B-**

Como es sabido, la apreciación de la prueba que realiza el TPI en el ejercicio de su sana discreción está revestido de confiabilidad y merece nuestro respeto y deferencia. *Argüello v. Argüello,* 155 DPR 62, 79 (2001) citando a *Pueblo v. Bonilla Romero*, 120 DPR 92, 111 (1987). En vista de lo anterior, la valoración que lleva a cabo el foro primario se presume correcta, toda vez que es este quien tiene la oportunidad de ver, escuchar y valorar las declaraciones de los testigos, así como sus lenguajes no verbales. *Pueblo v. Santiago et al.*, 176 DPR 133, 148 (2009); *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000). Al respecto, nuestro más Alto Foro ha expresado lo siguiente:

> [...] no sólo habla la voz viva. También hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical y sin embargo, todos estos elementos se pierden en la letra muda de las actas, por lo que se priva al Juez de otras tantas circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el instrumento más útil para la investigación de la verdad: la observación.
>
> *Pueblo v. Toro Martínez*, 200 DPR 834, 857 (2018), citando a *Ortiz v. Cruz Pabón*, 103 DPR 939, 947 (1995).

A esos efectos, el Tribunal Supremo de Puerto Rico ha resuelto que un tribunal revisor no debe sustituir su criterio por el del foro de instancia, salvo cuando estén presentes circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto. *Coop. Seguros Múltiples de P.R. v. Lugo*, 136 DPR 203, 208 (1994).

En consecuencia, este Tribunal Apelativo no debe intervenir con las determinaciones de hechos, con la apreciación de la prueba ni con la adjudicación de credibilidad efectuadas por el mismo, excepto en aquellas situaciones en que se demuestre que este último: (1) actuó con prejuicio o parcialidad; (2) incurrió en un craso abuso de discreción, o; (3) se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho

sustantivo. *Pueblo v. Irizarry,* 156 DPR 780, 789 (2002); *Pueblo v. Maisonave Rodríguez,* 129 DPR 49, 62-63 (1991). De igual forma, se podrá intervenir con la determinación del TPI cuando la referida valoración se aparte de la realidad fáctica o resulte inherentemente imposible o increíble. *Pueblo v. Martínez Landrón,* 202 DPR 409, 424 (2019) citando a *Pueblo v. Maisonave Rodríguez, supra,* pág. 63.

### -C-

El testimonio estereotipado es aquel que se limita a establecer "los elementos mínimos necesarios para sostener un delito sin incluir detalles imprescindibles para reforzarlos." *Pueblo v. Acevedo Estrada,* 150 DPRA 84, 93 (2000), citando a *Pueblo v. Rivera Rodríguez,* 123 DPR 443, 480 (1989). El uso de declaraciones estereotipadas, por cualquier tipo de testigo, debe ser objeto de escrutinio riguroso para evitar que declaraciones falsas o inexactas vulneren derechos de ciudadanos inocentes. *Pueblo v. Camilo Meléndez,* 148 DPR 539, 558 (1999), citando a *Pueblo v. González del Valle,* 102 DPR 374, 376 (1974).

Los criterios para evaluar la credibilidad de un testimonio estereotipado son los siguientes:

1. Debe ser escudriñado con especial rigor.

**2. Tanto los casos de "la evidencia abandonada" o "lanzada al suelo" como los casos del "acto ilegal a plena vista" deben, en ausencia de otras consideraciones, inducir sospecha de la posible existencia de testimonio estereotipado.**

3. Cuando el testimonio es inherentemente irreal o improbable debe rechazarse.

4. El testimonio estereotipado puede perder su condición de tal si, yendo más allá de los datos indispensables para probar los requisitos mínimos de un delito, se le rodea de las circunstancias en que funciona el agente, el término de su investigación, los resultados obtenidos fuera del caso en trámites y otros detalles.

5. La presencia de contradicciones o vaguedades en el testimonio debe tender a reforzar el recelo con que hay que escuchar esta clase de declaraciones.

6. El peso de la prueba de librar el testimonio estereotipado de sospecha recae en el Ministerio Público.

*Pueblo v. Camilo Meléndez, supra,* pág. 559, citando a *Pueblo v. González del Valle, supra,* págs. 374-375

Asimismo, "[u]n testimonio honesto no puede calificarse de estereotipado por el simple hecho de que exponga unas realidades fácticas que puedan formar parte del comportamiento usual y de las reacciones de algunas personas al confrontarse con agentes del orden público". *Pueblo v. Espinet Pagán,* 112 DPR 531, 536 (1982).

**-D-**

El derecho a la intimidad está consagrado en la Constitución del Estado Libre Asociado de Puerto Rico. Particularmente, el Artículo II, Sección 10 de la Constitución dispone, en lo aquí pertinente, que:

> **No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.**
>
> [...]
>
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar o registrarse, y las personas a detenerse o las cosas a ocuparse.
>
> **Evidencia obtenida en violación de esta sección será inadmisible en los tribunales.**
>
> (Énfasis suplido). Art. II, Sec. 10, Const. ELA [Const. PR], LPRA, Tomo 1

Cónsono con lo anterior, la Regla 234 de Procedimiento Criminal, 34 LPRA Ap. II, R. 234, provee el mecanismo para suprimir la evidencia obtenida mediante actuaciones irrazonables del Estado. Atinente a la controversia ante nos, la referida regla dispone que la persona agraviada podrá solicitar la supresión de cualquier evidencia si "la propiedad fue ilegalmente ocupada sin orden de allanamiento o registro".

El derecho a solicitar la supresión de evidencia es uno personal que solo lo puede ejercer la persona a quien se le haya violado el derecho constitucional contra los registros y allanamientos irrazonables. *Acarón et al. v. D.R.N.A.,* 186 DPR 564, 576 (2012); *Pueblo v. Ramos Santos,* 132 DPR 363, 374 (1992). Asimismo, el promovente está obligado a establecer que tiene una expectativa

razonable de intimidad respecto a lo que intenta suprimir. *Pueblo v. Santiago Feliciano,* 139 DPR 360, 384-385 (1995).

No obstante, la jurisprudencia ha establecido una serie de excepciones a la exigibilidad de una orden judicial previa a un registro e incautación de evidencia, entre estas se encuentran: (a) cuando se trata de un arresto incidental a un arresto válido; (b) **cuando se trata de evidencia que se encuentra a plena vista**; o (c) cuando se trata de evidencia abandonada. *Pueblo v. González Rivera,* 100 DPR 651 (1972); *Pueblo v. Dolce,* 105 DPR 422 (1976); *Pueblo v. Ortiz Martínez,* 116 DPR 139, 144 (1985); *Pueblo v. Castro Rosario,* 125 DPR 164 (1990).

Sobre la evidencia ocupada a plena vista, el Tribunal Supremo ha dispuesto que es admisible si están presentes los siguientes elementos: (1) el artículo debe ser descubierto por estar a plena vista y no en el curso o por razón de un registro; (2) el agente debe haber tenido un derecho previo a estar en la posición desde la cual se percató de la evidencia a ser incautada; (3) la misma debió ser descubierta inadvertidamente; y (4) la naturaleza delictiva del objeto debe surgir de la simple observación. *Pueblo v. Báez López,* 189 DPR 918, 938 (2013); *Pueblo v. Dolce,* 105 DPR 422, 436 (1976).

### III.

El Ministerio Público impugna la *Resolución* en virtud de la cual el foro primario declaró Ha Lugar la solicitud de supresión de evidencia instada por el señor Rosado Matías. Mediante el primer señalamiento de error, el peticionario arguye que el foro de instancia incidió al suprimir la evidencia incautada, ya que la misma fue ocupada tras haber sido observada a plena vista y posteriormente arrojada en medio de una persecución.

Cuando se trata de la excepción de evidencia percibida a plena vista, nuestro más Alto Foro ha establecido como requisito el que la misma haya sido descubierta inadvertidamente. En el caso de autos, quedó establecido que los agentes se encontraban en el lugar de los hechos con la única intención de

atrapar al recurrido en medio de un acto delictivo. Siendo así, no es posible colegir que el arma de fuego fue descubierta por inadvertencia.

Por otro lado, tal y como concluyó el foro recurrido, luego de que el Agte. Arce percibió al señor Rosado Matías, en posesión de un arma de fuego, los agentes tuvieron oportunidad de tramitar una orden de arresto. Sin embargo, optaron por continuar vigilando al recurrido hasta tanto lo observaron cometiendo un delito, el cual en esta instancia fue una infracción a las leyes de tránsito. Tomando en consideración las circunstancias del caso, resulta forzoso concluir que el Ministerio Público no logró establecer la existencia de la excepción de plena vista o que no se activó la protección constitucional contra registros y allanamientos irrazonables.

A través del segundo señalamiento de error, la parte peticionaria aduce que el TPI cometió un error al catalogar como estereotipado los testimonios provistos por los agentes del orden público. De manera particular, sostiene que los agentes proveyeron suficientes detalles de los cuales se desprenden los motivos fundados para el arresto del señor Rosado Matías.

Como regla general, nuestro más Alto Foro ha enfatizado que los testimonios relacionados con los casos de evidencia a plena vista y evidencia abandonada inducen sospecha. *Pueblo v. Camilo Meléndez, supra.* Conforme surge del dictamen recurrido, luego de evaluar los testimonios de los agentes, el foro de instancia identificó múltiples lagunas, vaguedades, contradicciones e inconsistencias que reforzaron el recelo o sospecha con la que debían ser evaluados los mismos. En otras palabras, no le otorgó credibilidad a la prueba testifical desfilada en la vista de supresión de evidencia.

Luego de escuchar y de un examen detenido de la prueba testifical, concluimos que el TPI no abusó de su discreción al dirimir la credibilidad de los testimonios. Recordemos que el foro de instancia se encuentra en mejor posición que los foros apelativos para evaluar los testimonios desfilados ante sí. Es por ello que, en ausencia de pasión, prejuicio, parcialidad o error manifiesto, determinamos no intervenir con la apreciación de la prueba realizada por el foro de instancia.

**IV.**

Por los fundamentos que anteceden, se *expide* el auto de *certiorari* y se *confirma* el dictamen recurrido.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal.

La Jueza Álvarez Esnard disiente con la siguiente expresión: "Surge del expediente y prueba presentada que existían motivos fundados transferidos, por lo que no era necesaria una orden judicial."

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones